STATE OF CONNECTICUT *v.* T.R.D.[1]
(SC 17865)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and Schaller, Js.[2]

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom the victims' identity may be ascertained. See General Statutes § 54-86e.

[2] This case originally was argued before a panel of this court consisting of Chief Justice Rogers and Justices Norcott, Vertefeuille, Zarella and Schaller. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justices Katz

and Palmer were added to the panel, and they have read the record, briefs and transcript of oral argument.

Argued September 7, 2007—officially released March 25, 2008

*Mary Beattie Schairer*, special public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Terence D. Mariani*, senior assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, T.R.D., appeals from the judgment of conviction, rendered after a jury trial, of failing to register as a sex offender in violation of General Statutes (Rev. to 2003) § 54-251[3] and General Statutes § 54-257.[4] He was sentenced to three years imprisonment, execution suspended after one year, and five years probation.

On appeal,[5] the defendant claims that: (1) the trial court improperly failed to canvass the defendant adequately in accordance with Practice Book § 44-3[6] before

[3] General Statutes (Rev. to 2003) § 54-251 (a) provides in relevant part: "Any person who has been convicted . . . of a criminal offense against a victim who is a [child] or a nonviolent sexual offense . . . and is released into the community on or after October 1, 1998, shall . . . register such person's name, identifying factors, criminal history record and residence address with the Commissioner of Public Safety, on such forms and in such locations as the commissioner shall direct, and shall maintain such registration for ten years except that any person . . . who is convicted of a violation of subdivision (2) of subsection (a) of section 53a-70 shall maintain such registration for life. . . . If such person changes such person's address such person shall, within five days, register the new address in writing with the Commissioner of Public Safety . . . . During such period of registration, each registrant shall complete and return forms mailed to such registrant to verify such registrant's residence address . . . ."

[4] General Statutes § 54-257 (c) provides in relevant part: "[T]he Department of Public Safety shall verify the address of each registrant by mailing a nonforwardable verification form to the registrant at the registrant's last reported address. Such form shall require the registrant to sign a statement that the registrant continues to reside at the registrant's last reported address and return the form by mail by a date which is ten days after the date such form was mailed to the registrant. The form shall contain a statement that failure to return the form or providing false information is a violation of section 54-251 . . . . Each person required to register under section 54-251 . . . shall have such person's address verified in such manner every ninety days after such person's initial registration date. . . ."

[5] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes

permitting him to proceed to trial without counsel, in violation of his constitutionally protected right to counsel; (2) the trial court improperly instructed the jury regarding the elements of the crime of which the defendant was ultimately convicted; (3) he was deprived of his constitutional due process rights when he was arrested before the state took further reasonable steps to contact him; and (4) prosecutorial impropriety in the state's closing argument deprived him of his constitutional right to a fair trial. We agree with the defendant's first claim, which is dispositive of this appeal. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial. We also address the merits of the state's second and third claims because they are likely to arise on retrial. See *Burns* v. *Hanson*, 249 Conn. 809, 830, 734 A.2d 964 (1999). Because we do not believe that the defendant's claim of prosecutorial impropriety is likely to arise on retrial, we do not reach this issue.

The following facts and procedural history are relevant to this appeal. On April 2, 1998, the defendant entered pleas of nolo contendere to charges of sexual assault in the first degree in violation of General Statutes (Rev. to 1997) § 53a-70 (a) (2) and risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (2). The court accepted the defendant's pleas and sentenced him to a total effective term of twelve years imprisonment, execution suspended after five years, followed by ten years of probation.

---

a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

The defendant was released from incarceration on November 15, 2002. Prior to being released from incarceration, the defendant met with the coordinator for sex offender registration at the correctional institution where he was being held, who informed the defendant of his responsibilities under the Connecticut sex offender registration law, commonly referred to as Megan's Law, General Statutes § 54-250 et seq. One such responsibility is to return address verification letters, which are sent by the sex offender registry unit (unit) of the department of public safety every ninety days. Prior to his release from incarceration, the defendant signed several forms stating that he understood his responsibilities under the registration law, and further, that he understood that noncompliance with these responsibilities would constitute a crime.

The unit sent the first letter to the defendant in its first round[7] of ninety day address verification letters on February 8, 2003, approximately ninety days after the defendant's release from incarceration. Although the defendant did not return the first letter sent by the unit for address verification purposes, he did return the second letter, which the unit received on February 27, 2003. The defendant was thus in compliance with his registration responsibilities for the first ninety day period. The unit sent the first letter in its next round of address verification letters on May 23, 2003. When the unit did not receive a response from the defendant, it subsequently sent two additional address verification letters. After the unit did not receive a response to any

---

[7] The unit sends nonforwardable letters to individuals on the sex offender registry every ninety days for address verification purposes. For each ninety day period, the unit's practice is to send up to three letters to an individual's address. The second and third letters become necessary only if the individual does not promptly return the first letter sent within the ninety day period. Thus a "round" of letters can include up to three letters sent within any particular ninety day period for purposes of verifying a convicted sex offender's current address.

of the three letters it sent in its address verification attempts for the period beginning May 23, 2003, the defendant's status changed to "failure to verify his address" and his address was considered unknown. The defendant was arrested for failure to comply with the registration requirements on February 24, 2004.

On June 9, 2004, the court appointed Attorney Christopher Sheehan to represent the defendant in response to the defendant's request for a public defender. On May 2, 2005, the defendant informed the court that he did not want Sheehan to represent him, citing his disappointment with Sheehan's lack of communication with the defendant. The judge encouraged the defendant to resolve his differences with his appointed attorney, and ordered a continuance of the case. On September 7, 2005, the defendant filed a pro se motion for a speedy trial. At a pretrial hearing on September 19, 2005, Sheehan advised the court that he did not believe it was prudent for the defendant to file the speedy trial motion, and the court agreed. The defendant decided to move forward with the motion despite Sheehan's advice, and the court granted the motion on September 19, 2005.

Sheehan began conducting voir dire for the defendant's jury trial on September 26, 2005, and the defendant made no mention of representing himself. Jury selection resumed on September 30, 2005, and on that date, the defendant again informed the court that he no longer wanted Sheehan to represent him. The court discouraged the defendant from dispensing with his court-appointed attorney, and strongly encouraged the defendant to, at a minimum, retain Sheehan as standby counsel. The defendant continued to insist that he wanted to represent himself, noting: "I believe that my lawyer is not effective in representing me and I'm not gonna keep him." The defendant requested that the judge appoint a different attorney. The court declined

to do so. The court then canvassed the defendant concerning his decision to waive his right to counsel and proceed pro se. The defendant indicated that he understood the implications of his decision to represent himself as outlined by the court. When the defendant again declined to have Sheehan serve as standby counsel, the court excused Sheehan from the proceedings. The defendant then conducted voir dire pro se, and subsequently represented himself at trial. The judge briefly canvassed the defendant again on October 3, 2005, minutes before opening statements were to begin. The case was tried to a jury, which found the defendant guilty of failing to register as a sex offender in accordance with §§ 54-251 and 54-257. On December 5, 2005, the trial court sentenced the defendant to three years incarceration, execution suspended after one year, and five years probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the defendant first claims that his waiver of counsel could not be found knowing and intelligent in the absence of anything in the record demonstrating that the defendant knew the possible term of incarceration, which implicates the defendant's right to counsel guaranteed by the sixth amendment to the United States constitution.[8] Specifically, the defendant claims[9] that

---

[8] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." The sixth amendment right to counsel is made applicable to state prosecutions through the due process clause of the fourteenth amendment. See *Gideon* v. *Wainwright*, 372 U.S. 335, 342, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

[9] Because the defendant did not preserve this claim properly in the trial court, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under *Golding*, the defendant can prevail on a claim only if the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and

his waiver of counsel was not knowing, intelligent and voluntary because the trial court failed to inform him of the range of possible penalties that he would face upon conviction. The state concedes that the court's canvass did not inform the defendant that the offense with which he was charged carried a sentence of one to five years imprisonment. The state nevertheless contends that the record reveals that "the defendant clearly and unequivocally stated that he wanted to proceed pro se rather than be represented by his appointed public defender, that he was literate, competent and understanding, and that he voluntarily exercised his informed free will." We agree with the defendant.[10]

The following additional facts are relevant to this claim. In its canvass,[11] the trial court asked the defen-

(4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. We conclude that his claim is reviewable under *Golding* because the record is adequate for review and the defendant's claim is one of constitutional magnitude alleging the violation of a fundamental right. See *Gideon* v. *Wainwright*, 372 U.S. 335, 342–43, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *State* v. *Piorkowski*, 243 Conn. 205, 214–15, 700 A.2d 1146 (1997).

[10] We analyze the defendant's claim solely under the federal constitution because he did not brief a state constitutional claim or provide an independent analysis under a particular provision of the state constitution. See *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992) (defendant must provide independent analysis under particular provision of state constitution).

[11] The court canvassed the defendant in relevant part as follows:

"The Court: Okay. Now before I let you make this decision, I have to ask you some questions. The purpose of these questions is to make sure you know what you're doing. Do you understand that?

"[The Defendant]: Yes, sir.

"The Court: These questions are not designed to trick you or to embarrass you. I'm required to ask them by law. Do you understand that?

"[The Defendant]: Yes, sir.

"The Court: First question. Have you had any alcohol, any medicine or any drugs today, anything that would interfere with your ability to understand what's going on?

"[The Defendant]: No, sir.

"The Court: Had enough time to think about this decision to remove . . . Sheehan from the case?

"[The Defendant]: Yes, sir.

dant a number of questions regarding, for example, whether the defendant had considered the consequences of self-representation and whether he under-

"The Court: And you're—I've explained to you that you haven't presented to me any grounds for appointment of a new attorney. Do you understand that? You heard what I said, correct?

"[The Defendant]: Yes, I heard what you said, sir.

"The Court: And you've had enough time to think about this decision about abandoning your representation by . . . Sheehan?

"[The Defendant]: Yes, sir.

"The Court: Okay. Now, you've studied the case yourself.

"[The Defendant]: Yes, sir.

"The Court: And you have a strategy as far as how you're going to present a defense?

"[The Defendant]: Yes, sir.

"The Court: Okay. And you've had enough time to think about that?

"[The Defendant]: Yes, sir.

"The Court: Okay. And you feel the only way that you can accomplish that is by you doing that yourself, correct?

"[The Defendant]: No, that's not what I'm saying. What I'm saying is that I understand my case enough to understand to realize when someone [does] not have the interest in representing my interest.

"The Court: And that's why you want to fire . . . Sheehan?

"[The Defendant]: Yes, because—

"The Court: Do you understand the consequences of that is that you're gonna have to represent yourself?

"[The Defendant]: Yes. And like I say, that's the chances I'll be willing to take. . . .

"The Court: . . . Now you yourself are gonna have to do the questioning and make a statement to the jury when they come out. Are you ready to do that?

"[The Defendant]: Yes, sir.

"The Court: Okay. And you're gonna have to cross-examine the witnesses, you're gonna have to decide whether to testify or not to testify.

"[The Defendant]: Yes, sir.

"The Court: You know what the down side of testifying is in this case? Do you know what the risk is there?

"[The Defendant]: I would appreciate if the court will explain it.

"The Court: If you testify, your prior records, your felony—well, they already know about your felony conviction. So maybe there isn't much of a down side as far as that's concerned. They already know that you've been convicted of some kind of sexual assault. You're not going to be able to walk around the courtroom. You'[re] going to be able to address the jury right from the defense table, okay?

"[The Defendant]: Yes, sir."

stood the practical consequences of proceeding pro se (e.g., that the defendant would have to conduct cross-examination by himself and decide whether to testify). The court also informed the defendant that he did not believe the defendant's decision to proceed without an attorney was a wise one.[12] The state concedes, however,

[12] The court canvassed the defendant in relevant part as follows:

"The Court: . . . It's always a good idea to keep a record of—a clear record on the defendant's choice when he's representing himself. So I have to ask you some questions, okay . . . ?

"[The Defendant]: Yes, sir.

"The Court: And [the] first one is how do you feel today? This is a lot of pressure.

"[The Defendant]: I'm feeling fine, sir.

"The Court: Any technical questions you want to ask me?

"[The Defendant]: Not at this moment, sir.

"The Court: Okay. Good. Now, you got a lot of papers there and you seem well organized. You pretty much have anticipated what the state's evidence is going to be, right?

"[The Defendant]: Yes, sir. . . .

"The Court: Okay. And you've thought about your defense, and you know—obviously you've listed some witnesses and you know exactly what you want to prove, correct?

"[The Defendant]: Yes, sir.

"The Court: Nobody is forcing you to make this choice?

"[The Defendant]: No, sir. Choice such as? You're saying no one is forcing me to make—

"The Court: I guess I'm forcing you to make this choice because I wouldn't let you hire another attorney.

"[The Defendant]: I'm pretty much comfortable with it, sir. I respect your decision.

"The Court: Okay. And you know what my opinion is about the wisdom of your choice.

"[The Defendant]: Yes, sir. You still give me an opportunity.

"The Court: Yes. The case is going to get—although it's a simple case, I believe it's going to get a little harder. If you want . . . Sheehan at any point, he'll come up here and sit here and answer any technical questions. He'll take over the questioning of the witnesses. He'll do it all for you. Just tell me at any point, okay?

"[The Defendant]: Okay, sir.

"The Court: Knowing all that, you still want to proceed in representing yourself?

"[The Defendant]: Yes, sir.

"The Court: Okay. All right. Work on your opening statement.

"[The Defendant]: It's going to be pretty short.

that the court never specifically advised the defendant of the range of possible penalties he faced upon conviction.

At the outset, we identify the applicable standard of review. "We review [a] trial court's determination with respect to whether the defendant knowingly and voluntarily elected to proceed pro se for abuse of discretion." *State* v. *D'Antonio*, 274 Conn. 658, 709, 877 A.2d 696 (2005).

We begin with several well settled principles regarding the constitutional right of an accused to represent himself. "The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . . *State* v. *Wolff*, 237 Conn. 633, 654, 678 A.2d 1369 (1996). When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associ-

---

"The Court: Good. My experience is that any kind of message that's directed to the point usually gets across. You look like you want to say something.

"[The Prosecutor]: Just a couple things. . . . You just spoke and said you wouldn't let [the defendant] hire another attorney. I don't think that was accurate.

"The Court: Did I say that?

"The Clerk: Yes, sir.

"[The Prosecutor]: He never indicated he was interested in hiring another attorney. He wanted a different public defender.

"The Court: I don't think he ever said he wanted to hire an attorney. He wanted me to appoint him another special public defender.

"[The Prosecutor]: I think that's clear for the record."

ated with the right to counsel. For this reason, in order to represent himself, the accused must knowingly and intelligently [forgo] those relinquished benefits. . . . *State* v. *Frye*, 224 Conn. 253, 256, 617 A.2d 1382 (1992). The state bears the burden of demonstrating that the defendant knowingly and intelligently waived his right to counsel. Id., 260." (Internal quotation marks omitted.) *State* v. *Diaz*, 274 Conn. 818, 828–29, 878 A.2d 1078 (2005).

"[Practice Book § 44-3] was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . . Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with § [44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. . . . Because the § [44-3] inquiry simultaneously triggers the constitutional right of a defendant to represent himself and enables the waiver of the constitutional right of a defendant to counsel, the provisions of § [44-3] cannot be construed to require anything more than is constitutionally mandated. . . .

"The nature of the inquiry that must be conducted to substantiate an effective waiver has been explicitly articulated in decisions by various federal courts of appeals. See, e.g., *United States* v. *Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995) (court must inform defendant of charges, included offenses and possible range of punishment); *United States* v. *Hurtado*, 47 F.3d 577, 583 [2d Cir.] (factors determining valid waiver include whether defendant understood that he had choice between proceeding pro se and with assigned counsel, understood advantages of having trained counsel, and had capacity to make intelligent choice) [cert. denied, 516 U.S. 903, 116 S. Ct. 266, 133 L. Ed. 2d 188 (1995)]; *United States* v. *Van Krieken*, 39 F.3d 277, 229 (9th Cir. 1994) (defendant must be aware of nature of charges against him, possible

penalties and disadvantages of self-representation); *Government of Virgin Islands* v. *James*, 934 F.2d 468, 471 (3d Cir. 1991) (waiver must be made with apprehension of nature of charges, statutory offenses included within them, range of allowable punishments thereunder, possible defenses to charges, circumstances in mitigation thereof, and all other facts essential to broad understanding of whole matter); *United States* v. *Silkwood*, 893 F.2d 245, 249 (10th Cir. 1989) (same) [cert. denied, 496 U.S. 908, 110 S. Ct. 2593, 110 L. Ed. 2d 274 (1990)]; *United States* v. *McDowell*, 814 F.2d 245, 251 [6th Cir.] (model inquiry includes questioning about defendant's legal background, knowledge of crimes charged, possible punishments, familiarity with Federal Rules of Evidence and Criminal Procedure, procedure for testifying, and advice that defendant would be better served by representation by trained attorney) [cert. denied, 484 U.S. 980, 108 S. Ct. 478, 98 L. Ed. 2d 781 (1987)]." (Internal quotation marks omitted.) *State* v. *Diaz*, supra, 274 Conn. 829–30.

"The defendant, however, does not possess a constitutional right to a specifically formulated canvass [with respect to this inquiry]. His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish that the defendant's waiver was voluntary and knowing. . . . In other words, the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in Practice Book § [44-3] if the record is sufficient to establish that the waiver is voluntary and knowing." (Internal quotation marks omitted.) Id., 831.

The defendant in the present case asserts that the state cannot meet its burden of proving that the defendant voluntarily, knowingly and intelligently waived his right to counsel. Specifically, the defendant contends that the trial court's canvass was constitutionally insuf-

ficient because the defendant was never made aware of the range of punishments that he could face upon conviction. This court recently addressed the adequacy of a canvass under almost identical factual circumstances in *State* v. *Diaz*, supra, 274 Conn. 818. In *Diaz*, the defendant waived his right to counsel after the trial court had canvassed the defendant in accordance with Practice Book § 44-3. The defendant thereafter represented himself at trial, and a jury ultimately found him guilty on all counts as charged. Id., 819. On appeal, the defendant claimed that his waiver of counsel was not knowing and voluntary because the trial court had failed to advise him correctly about the range of possible punishments that could be imposed upon conviction. Id., 828. We reversed the judgment of the trial court, and ruled that the defendant's waiver of counsel was not knowing and intelligent because he did not have an understanding of the range of punishment he faced upon conviction. Id., 833–34. In reversing the defendant's conviction, we were well aware that the defendant had some appreciation that he faced the possibility of a substantial period of incarceration, as the defendant had rejected the state's plea offer of fifteen years imprisonment, which had been made on the record. Id., 826. In addition, at one point during the trial in *Diaz*, the court informed the defendant that "[t]hese are big prison time cases," to which the defendant responded: "Yes, I understand that, Your Honor. It appears to be that way." (Internal quotation marks omitted.) Id., 827. Even in light of these cautionary words, however, we were not persuaded that the imprecise language used by the trial court was sufficient to satisfy the constitutional requirement that the defendant be advised of the range of permissible punishments he faced upon conviction, which was a period of nearly fifty years. Id., 831. *Diaz* controls the resolution of this issue in the present case.[13]

[13] We disagree with the dissent's attempts to distinguish *State* v. *Diaz*, supra, 274 Conn. 818, which we find controlling in the present case. The constitutional requirement that the defendant have a "meaningful apprecia-

In the present case, as in *Diaz*, there is simply no evidence present in the record from which we could infer that the defendant had any meaningful appreciation of the period of incarceration he faced if convicted of the charges he faced. "In such circumstances, it cannot be said that the defendant 'received a realistic picture from [the court] regarding the magnitude of his decision [to proceed to trial without counsel].' *United States* v. *Fore*, 169 F.3d 104, 108 (2d Cir.), cert. denied, 527 U.S. 1028, 119 S. Ct. 2380, 144 L. Ed. 2d 783 (1999). In other words, the record does not establish that the defendant 'knew what he [was] doing and [that] his choice [was] made with eyes open,' as the constitution requires. . . . *State* v. *Day*, 233 Conn. 813, 828, 661 A.2d 539 (1995), quoting *Faretta* v. *California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)." *State* v. *Diaz*, supra, 274 Conn. 833–34.

"The right to counsel is so basic that its violation mandates reversal even if no particular prejudice is shown and even if there is overwhelming evidence of guilt." (Internal quotation marks omitted.) *State* v. *Frye*, supra, 224 Conn. 262. We conclude that the trial court's failure to conduct an adequate canvass to ensure that the defendant's waiver of the right to counsel was made knowingly and intelligently constitutes an abuse of discretion and, accordingly, requires that the defendant be granted a new trial.

## II

Because of our conclusion that this case must be retried, it is appropriate for us to give guidance on issues that are likely to arise upon retrial. See *Burns* v. *Hanson*, supra, 249 Conn. 830. Thus, we will address the defendant's claim that his conviction under § 54-257

tion of the true magnitude of the sentence that he faced" applies irrespective of whether the sentence is quite substantial, as in *Diaz*, or more moderate, as in the present case. Id., 832.

deprived him of his due process rights.[14] Specifically, the defendant asserts that the state was obligated to take further reasonable steps to contact him after he failed to respond to all three address verification forms that the unit sent to the defendant in its second round of letters. The state responds that the defendant had actual notice that he was statutorily required to verify his address every ninety days, and that he was deprived of his liberty only after a jury trial. Accordingly, the state contends, the defendant received full due process of law. We agree with the state.

The following additional facts are necessary for our resolution of the defendant's claim. Prior to the defendant's release from prison after conviction for sexual assault in the first degree in violation of § 53a-70 (a) (2) and risk of injury to a child in violation of § 53-21 (2), he was formally apprised of his registration responsibilities under the state's sex offender registry, as required by General Statutes (Rev. to 2003) § 54-256.[15]

[14] We analyze the defendant's claim solely under the federal constitution because he failed to brief a state constitutional claim or provide an independent analysis under a particular provision of the state constitution. See *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992) (defendant must provide independent analysis under particular provision of state constitution).

[15] General Statutes (Rev. to 2003) § 54-256 provides in relevant part: "Any court, the Commissioner of Correction or the Psychiatric Security Review Board, prior to releasing into the community any person convicted or found not guilty by reason of mental disease or defect of a criminal offense against a victim who is a minor, a nonviolent sexual offense, a sexually violent offense or a felony found by the sentencing court to have been committed for a sexual purpose, except a person being released unconditionally at the conclusion of such person's sentence or commitment, shall require as a condition of such release that such person complete the registration procedure established by the Commissioner of Public Safety under sections 54-251, 54-252 and 54-254. The court, the Commissioner of Correction or the Psychiatric Security Review Board, as the case may be, shall provide the person with a written summary of the person's obligations under sections 54-102g and 54-250 to 54-258a, inclusive, and transmit the completed registration package to the Commissioner of Public Safety who shall enter the information into the registry established under section 54-257. . . ."

Specifically, prior to his release, the defendant met with Scott Tetreault, the coordinator for sex offender registration, at the Brooklyn correctional institution. At that meeting, Tetreault obtained the defendant's post-release address and gave the defendant a number of forms to complete, two of which were entitled "Sex Offender Advisement of Registration Requirement" and "Sex Offender Registry—Registration Form."

The form entitled "Sex Offender Advisement of Registration Requirement" contained a section captioned "Notice To Registrant," which provided as follows: "As a person who has been convicted of any crime specified in [§] 54-250 . . . or as one who is required to register by [§§] 54-251 through . . . 54-255 . . . inclusive, with the State of Connecticut Sex Offender Registry, you must report in person to the [unit]. Failure to comply with this requirement is a Class D Felony. After completing the initial registration you will further be required to return address verification forms that will be mailed to you at your last known address. These address verification forms must be returned to the Department of Public Safety at P.O. Box 2794, Middletown, CT 06457-9294, by first class mail. You must also notify the Department of Public Safety Sex Offender Registry within five days of changing your address and you must notify the appropriate law enforcement authorities if you move into another state. Failure to comply with any of these requirements will make you subject to arrest for a Class D Felony." Both the defendant's and Tetreault's signatures appear at the bottom of the form.

The defendant also signed a form captioned "Sex Offender Registry—Registration Form" at the meeting with Tetreault. The bottom of this form contained the following information, with the underlined text included: "Full registration requires all of the following: completion of this form, a full set of fingerprints and a photograph taken at the time of registration, and a

blood sample taken for the purposes of DNA analysis. Failure to complete <u>ALL</u> registration requirements is a Class D felony." Both the defendant's and Tetreault's signatures appear on this form. After the meeting, Tetreault forwarded the aforementioned forms to the unit. The unit received both forms containing the defendant's signature on November 15, 2002, the same day the defendant was released from incarceration.

In accordance with its policy on address verification, the unit sent the first letter in its first round of correspondence on February 8, 2003, approximately ninety days after the defendant was released from incarceration.[16] This letter was not returned.[16] The unit then sent a second letter to the defendant in an effort to verify his address. The second paragraph of this letter provides, with the bold face text included: "The . . . [unit] is required to verify your residence address every [ninety] days. This verification of your address will be accomplished via the mail every [ninety] days until you are relieved of your registration requirement. **You must return this address verification letter within ten (10) days of the postmark.** The address that appears with your name at the top of this letter is the address of record for you. If you move you must notify the [unit], in writing, within five (5) days of such a change. If the address is incorrect as it appears, make the necessary corrections in the residence address correction space below."

On February 27, 2003, the unit received from the defendant a completed copy of the second letter. In the space on the form following the words "[r]esidence

---

[16] At trial, Michael Pirolli, a state police officer working with the unit, explained that the unit sends these address verification letters to sex offenders in "batch[es]" of 300 to 400 letters and keeps an alphabetized list of individuals to whom letters are sent in each "batch." Pirolli testified that the men whose names appear immediately before and immediately after the defendant's name on the alphabetized list received and returned their letters.

address correction," the defendant wrote the word "same." The defendant's signature appears at the bottom of the form, followed by the date of February 25, 2003, and his telephone number. The defendant's signature appears below a paragraph stating: "My current address is correct as it appears above. I understand that failure to comply with any of the registration requirements, including the address verification and above listed notifications, is a Class 'D' Felony."

The unit sent the first letter in its next round of address verification letters on May 23, 2003. When this letter was not returned by the defendant, the unit subsequently sent two additional letters, on June 13, 2003, and June 24, 2003, respectively. When neither of these letters was returned to the unit, the unit identified the defendant's status as "failure to verify his address," and the address was considered unknown. The defendant was arrested for failure to comply with the registration requirements on February 24, 2004. Three days after his arrest, on February 27, 2004, the unit received a typewritten letter from the defendant, dated February 25, 2004, informing it that his address had remained the same.

We begin with the standard of review. Whether the defendant was deprived of his due process rights is a question of law, to which we grant plenary review. See *State* v. *Long*, 268 Conn. 508, 520–21, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

The defendant asserts[17] that the state was obligated to make further attempts to contact him before

---

[17] Because the defendant's claim was unpreserved at trial, he seeks review under *Golding*. See footnote 9 of this opinion. Because the record is adequate for review and the defendant's claim is of constitutional magnitude, we conclude that the claim is reviewable under *Golding*. See *State* v. *Cohens*, 62 Conn. App. 345, 350, 773 A.2d 363 ("[t]he first two steps in the *Golding* analysis address the reviewability of the claim, whereas the last two steps address the merits of the claim"), cert. denied, 256 Conn. 918, 774 A.2d 139 (2001).

arresting him, and relies on *Jones* v. *Flowers*, 547 U.S. 220, 126 S. Ct. 1708, 164 L. Ed. 2d 415 (2006), in support of his claim. In *Flowers*, the United States Supreme Court addressed the issue of whether, "when notice of a tax sale is mailed to the owner and returned undelivered, the government must take additional reasonable steps to provide notice before taking the owner's property." Id., 223. The commissioner of state lands attempted to inform a taxpayer of his tax delinquency by mailing two certified letters to the address that was the object of the delinquency. Id., 223–24. Although both letters were returned "unclaimed," the commissioner argued that the two letters were a constitutionally adequate attempt at notice. Id., 224. The Arkansas Supreme Court agreed, and affirmed the trial court's ruling, holding that attempting to provide notice by certified mail satisfied due process under the circumstances presented. *Jones* v. *Flowers*, 359 Ark. 443, 454, 198 S.W.3d 520 (2004). The United States Supreme Court reversed, noting that while "[d]ue process does not require that a property owner receive actual notice before the government may take his property," more was required under the circumstances presented. *Jones* v. *Flowers*, supra, 547 U.S. 226. Specifically, because the notice was returned undelivered, the state had a duty to take further action because no one "who actually desired to inform a real property owner of an impending tax sale of a house he owns would do nothing when a certified letter sent to the owner is returned unclaimed." Id., 229. Thus, the knowledge that something had "gone awry" required the state to depart from its usual method of providing reasonable notice. Id., 226.

The defendant's reliance on *Flowers* is misplaced. First, the defendant in the present case had actual notice of his obligation to verify his address continually with the unit as part of his responsibilities as a convicted sex offender. Moreover, unlike the situation in *Flowers*,

the sender in the present case—the unit—had no indication that the letters that it had sent to the defendant's address never actually reached the defendant. To the contrary, because the other individuals whose names were listed immediately before and after the defendant's on the registry list received and returned their letters, the unit had every reason to believe that the defendant had received the letters. Moreover, the evidence also showed that three days after his arrest, the unit received a typewritten letter generated by the defendant himself, dated February 25, 2004, indicating that his address remained the same. Accordingly, under the facts of this case, we conclude that the defendant was not deprived of due process because the state did not take additional steps to contact him before seeking his arrest.

Our conclusion is supported by a recent opinion of the Illinois Supreme Court, *People* v. *Molnar*, 222 Ill. 2d 495, 857 N.E.2d 209 (2006). In *Molnar*, the court considered the Illinois Sex Offender Registration Act, which is similar to our statutory scheme in that it requires the state police to send nonforwardable letters to the offender for address verification purposes. Id., 500–501. Under the Illinois statute, the sex offender must complete, sign and return the forms within ten days after the letter is mailed. Id., 501. The defendant in *Molnar* claimed, inter alia, that the state's registration statute was unconstitutional because the state police were not required to notify a registrant that he had violated the statute. Id., 505. The trial court agreed with the defendant, and held that a municipal ordinance imposing a registration requirement on a convicted felon was unconstitutional as applied. Id., 507. The Illinois Supreme Court reversed, however, holding that the statute was constitutional because the defendant had actual knowledge of the registration requirements. Id., 513. Specifically, the court cited as evidence of the

defendant's knowledge the fact that upon registration, "[t]he defendant signed and initialed the registration form that again notified him of his duties under the [Sex Offender] Registration Act" and the fact that the registration form itself "notified the defendant that a violation of any provision of [that act] would result in a [ten] year extension of the registration period and would constitute a [c]lass 4 felony." Id.

We find the conclusion of the Illinois Supreme Court in a case with similar facts to be persuasive. In the present case, the record demonstrates that the defendant had actual notice of his duty to register as a sex offender. Specifically, eight days before he was released from incarceration, the defendant was formally apprised of his responsibilities under the registry statutes by Tetreault. Notably, one of the forms he signed contained the statement: "After completing the initial registration you will further be required to return address verification forms that will be mailed to you at your last known address. . . . Failure to comply with any of these requirements will make you subject to arrest for a [c]lass D felony." Additionally, approximately ninety days after he was released from prison, the defendant returned a letter sent by the unit in its first round of address verification attempts, evidence indicating that he had sufficient capacity to comply with his statutory obligations. We thus reject the defendant's claim that the state failed to take further reasonable steps to contact him before arresting him for his failure to comply with his registration obligations.

### III

The defendant also claims that the trial court improperly instructed the jury.[18] Specifically, the defendant

---

[18] The defendant claims that §§ 54-251 and 54-257 are unconstitutional absent a requirement of an element of mens rea. We decline to review this claim because it was inadequately briefed. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere

asserts that the trial court improperly failed to include an element of mens rea in its instruction regarding §§ 54-251 and 54-257, and that the defendant was entitled to a jury instruction that the state must prove that the defendant had a duty to return the address verification forms and that he actually knew of this duty.[19] The state responds that the trial court's charge on the elements of failure to register as a sex offender was correct in law because failure to register is a strict liability offense, and because the issue of whether the defendant knew he was obligated to verify his address is not an element of the offense. We agree with the state.

"Our analysis begins with a well established standard of review. When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quota-

abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 266 Conn. 108, 120, 830 A.2d 1121 (2003). The defendant in the present case devoted a mere three quarters of a page in his brief to this claim, and failed to explicate adequately why a mens rea element is constitutionally required.

[19] The defendant did not preserve these issues at trial and thus seeks review under *Golding.* See footnote 9 of this opinion. Because the record is adequate for review and the defendant's claim is of constitutional magnitude, we conclude that the claim is reviewable under *Golding.*

tion marks omitted.) *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995).

"It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . *State* v. *Gabriel*, 192 Conn. 405, 413–14, 473 A.2d 300 (1984). Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are." (Citations omitted; internal quotation marks omitted.) *State* v. *Denby*, supra, 235 Conn. 483–84.

"[I]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 106, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The test of a charge is whether

it is correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a right decision in a particular case." (Citations omitted; internal quotation marks omitted.) *State* v. *Lemoine*, 233 Conn. 502, 509–10, 659 A.2d 1194 (1995).

## A

We first consider whether the trial court improperly failed to include an element of mens rea in its instruction, and that such an element is required for the statute to be constitutional. The following additional facts are relevant to our resolution of the defendant's claims. At the close of evidence, the trial judge charged the jury. In doing so, the court first quoted portions of §§ 54-251 and 54-257. The court instructed the jury as follows: "In order to find the defendant guilty as charged in count one of the information, the state must prove the following elements beyond a reasonable doubt: One, that the defendant has been convicted of a criminal offense against a victim who is a [child] or that the defendant was convicted of a violation of subdivision (2) of subsection (a) of § 53a-70. And you heard the evidence there. These are the elements that have to be proven beyond a reasonable doubt. I just read you number one. Two, that the defendant was released into the community on or after October 1, 1998; three, that the department of public safety mailed a nonfowardable verification form to the registrant at the registrant's last reported address in the manner described above where I spoke of . . . § 54-257; four, that the defendant was required by our Penal Code to return the address verification form; five, and lastly, number five, that the defen-

dant failed to return the address verification form as required by our law." The court then explained that the law requires convicted sex offenders to return the address verification forms regardless of whether they reside at the same address that they may have previously provided. The court then went on to define a number of terms included in the instruction including "convicted," "criminal offense against a victim who is a [child]," and "release into the community." The court concluded the charge as follows: "The allegation by the state and the determination to be made by you is whether or not the defendant complied with the requirements of the sex offender registry as they relate to returning the address verification forms allegedly mailed to the defendant by the department of public safety. If you are satisfied—if you are all satisfied beyond a reasonable doubt that the state has proven all of these elements beyond a reasonable doubt, then you must find the defendant guilty. If you are not satisfied beyond a reasonable doubt as to any one of the elements, then you must find the defendant not guilty."

We begin with a brief review of our law regarding mens rea. "While the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime, and this was followed in regard to statutory crimes, even where the statutory definition did not in terms include it . . . there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. . . . [T]he common-law concept that criminal acts require the coupling of the evil-meaning mind with the evil-doing hand and may define crimes which depend on no mental element, but consist only of forbidden acts or omissions. . . . Whether or not a statutory crime requires mens rea or scienter as an element of the offense is largely a question of legislative intent to be determined from the

general scope of the act and from the nature of the evils to be avoided." (Citations omitted; internal quotation marks omitted.) *State* v. *Kreminski*, 178 Conn. 145, 148–49, 422 A.2d 294 (1979).

" 'When the commission of an offense defined in [the Penal Code], or some element of an offense, requires a particular mental state, such mental state is ordinarily designated in the statute defining the offense by use of the terms "intentionally", "knowingly", "recklessly" or "criminal negligence", or by use of terms such as "with intent to defraud" and "knowing it to be false", describing a specific kind of intent or knowledge. . . .' Generally, the absence of any such requirement demonstrates that the legislature did not intend to make it an element of the crime." (Citations omitted.) *State* v. *Hill*, 256 Conn. 412, 419, 773 A.2d 931 (2001).

A plain reading of §§ 54-251 and 54-257 reveals that neither contains an element of intent. Although there is generally a presumption that crimes having their origin in the common law contain an element of intent; *United States* v. *United States Gypsum Co.*, 438 U.S. 422, 437, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978); the registry statutes do not have their origin in the common law and this presumption therefore does not apply. See *State* v. *Swain*, 245 Conn. 442, 454 n.16, 718 A.2d 1 (1998).

The absence of a mens rea element in a statute does not necessarily mean, however, that the statute is strict liability. Alternatively, the statute may require an element of general intent. As explained by the Appellate Court in *State* v. *Charles*, 78 Conn. App. 125, 826 A.2d 1172, cert. denied, 266 Conn. 908, 832 A.2d 73 (2003), "[g]eneral intent is the term used to define the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing

a prohibited result through accident, mistake, carelessness, or absent-mindedness. Where a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts." (Internal quotation marks omitted.) Id., 131, quoting 21 Am. Jur. 2d 213–14, Criminal Law § 127 (1998). In *Charles*, the court considered the defendant's claim that the trial court violated the defendant's due process rights by failing to charge the jury that intent was a necessary element of the crime of violating a protective order.[20] The Appellate Court affirmed the trial court's decision, but declined to rule that the statute was strict liability, instead finding an element of general intent to be required: "Having declined to adopt the argument that criminal responsibility for the violation of a protective order requires specific intent, we have not, nevertheless, held that the statute is one of strict liability. Rather, we believe that it is a general intent statute, requiring proof that one charged with its violation intended to perform the activities that constituted a violation of the protection order." *State* v. *Charles*, supra, 131.

In contrast, strict liability offenses dispense with the mens rea of a crime, meaning that the possession of a " 'guilty mind' " is not essential before a conviction can take hold. *Staples* v. *United States*, 511 U.S. 600, 607 n.3, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994). In strict liability statutes, it is "not required that the defendant know the facts that make his conduct fit the definition of the offense." Id. The United States Supreme Court outlined the reasoning for imposing strict criminal lia-

---

[20] The statute at issue in *Charles*, General Statutes (Rev. to 1999) § 53a-110b, which had been recodified at General Statutes § 53a-223 (a) when the Appellate Court decided the case, provides: "A person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of section 46b-38c, or section 54-1k or 54-82r has been issued against such person, and such person violates such order."

bility for public welfare offenses over one half century ago in *Morissette* v. *United States*, 342 U.S. 246, 254–56, 72 S. Ct. 240, 96 L. Ed. 288 (1952): "While many of these [regulations on activities that affect public health, safety or welfare] are sanctioned by a more strict civil liability, lawmakers, whether wisely or not, have sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions. This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have aptly been called 'public welfare offenses.' These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or *inaction where it imposes a duty.* . . . In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." (Emphasis added.)

Given the legislative purpose of the sex offender registry as a whole, we conclude that the crime of failing to comply with the sex offender registry requirements is a strict liability offense. The goal of Megan's Law is to "alert the public by identifying potential sexual offender recidivists when necessary for public safety." *State* v. *Pierce,* 69 Conn. App. 516, 552, 794 A.2d 1123 (2002), rev'd in part, 269 Conn. 442, 849 A.2d 375 (2004).

Indeed the United States Supreme Court has noted that Connecticut's version of Megan's Law was created in response to the fact that "[s]ex offenders are a serious threat in this [n]ation" and that "[t]he victims of sexual assault are most often juveniles . . . ." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Doe*, 538 U.S. 1, 4, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003). The Supreme Court noted that the particular threat sex offenders present stems from the observation that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." (Internal quotation marks omitted.) Id.

Two well reasoned decisions from Illinois and New York support our conclusion that failing to register is a strict liability offense. In *People* v. *Molnar*, supra, 222 Ill. 2d 495, and *People* v. *Patterson*, 185 Misc. 2d 519, 708 N.Y.S.2d 815 (2000), the Illinois Supreme Court and the New York Criminal Court, respectively, interpreted sex offender registry statutes similar to ours and found them to impose strict liability. In *People* v. *Molnar*, supra, 502–503, the Illinois Supreme Court reviewed a sex offender registry scheme that requires the state police to send nonforwardable verification letters that the sex offender must complete and return within ten days. The provision stating the consequences of not registering provides as follows: "A sex offender shall register in person annually within one year after his or her last registration. Failure to comply with any provision of the [Sex Offender Registration] Act shall extend the period of registration by ten years beyond the period otherwise required." (Internal quotation marks omitted.) Id., 509, quoting 20 Ill. Admin. Code tit. 20, § 1280.40 (a) (2002). The Illinois Supreme Court concluded that the offense of violating the state's registration act was a strict liability offense. Crucial to the court's analysis was the notion that "the imposition of

strict liability for failing to register was not as harsh as it first appeared, given that [the statute as a whole] required an offender to be given notice of his obligation to register." *People* v. *Molnar,* supra, 523. For that reason, the court found that "the concern that a person might be subject to a severe penalty for an offense that he might unknowingly commit is not present . . . ." Id.

In so ruling, the *Molnar* court relied heavily on the reasoning of *People* v. *Patterson,* supra, 185 Misc. 2d 519, wherein the New York Criminal Court considered, inter alia, whether failure to register as a sex offender[21] under New York's Sex Offender Registration Act was a strict liability crime. Although violation of the statute could result in the revocation of parole and/or a felony conviction upon a second offense, the court reasoned that the state's registration act is "not a traditional criminal statute aimed primarily at punishing wrongdoing" but is instead "in essence a regulatory statute . . . [which] proceeds from a legislative finding that convicted sex offenders exhibit heightened rates of recidivism and that sex offenders therefore present a special danger to the public and, in particular, to vulnerable women and children. [New York's Sex Offender Registration Act] is thus primarily intended as a measure to foster public safety." Id., 530.

In light of the legislative purpose of the statute, the New York Criminal Court reasoned that strict liability was appropriate: "Viewed in the light of the important

---

[21] New York Correction Law § 168-t (McKinney 2003) provides: "Any sex offender required to register or to verify pursuant to the provisions of this article who fails to register or verify in the manner and within the time periods provided for herein shall be guilty of a class A misdemeanor upon conviction for the first offense, and upon conviction for a second or subsequent offense shall be guilty of a class D felony. Any such failure to register or verify may also be the basis for revocation of parole pursuant to section two hundred fifty-nine-i of the executive law or the basis for revocation of probation pursuant to article four hundred ten of the criminal procedure law."

public safety concerns that are at the heart of [the Sex Offender Registration Act], the [l]egislature's decision to impose strict liability for failure to register was altogether appropriate and consistent with precedent. The power of a [l]egislature to enact a criminal statute imposing strict liability for an essentially regulatory offense involving the public safety, health or welfare has long been recognized. . . . In dealing with such offenses, the urgent public interest in protecting the community's welfare may require that in the prohibition or punishment of particular acts it may be provided that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance." (Citations omitted; internal quotation marks omitted.) Id., 530–31.

The policy justifications for imposing strict liability are compelling as well. Like the sex offender registry examined in *Patterson*, our registration requirements are "not intended as a punitive measure" and are a "separate regulatory incident" of a criminal judgment of conviction. *State* v. *Waterman*, 264 Conn. 484, 489, 825 A.2d 63 (2003). The imposition of strict liability for failure to register as a sex offender "strikes a careful balance between [the] defendant's due process rights and the community's interest in protecting its most vulnerable citizens from truly terrible crimes." *People* v. *Patterson*, supra, 185 Misc. 2d 534. That is, although § 54-256 requires that a convicted sex offender be notified of his obligations regarding the sex offender registry, the strict liability nature of the offense ensures that a sex offender will not be able to defeat prosecution under § 54-257 "simply by claiming that he did not know about [the relevant registration statute], or that he unintentionally overlooked its requirements, or that he had adopted some privately held interpretation of the statute under which he was not required to register." Id. Thus, we conclude that interpreting our registration

statute to be one of strict liability is more appropriate than reading it as requiring general intent, where "accident, mistake, carelessness, or absent-mindedness" could potentially serve as a defense. (Internal quotation marks omitted.) *State* v. *Charles*, supra, 78 Conn. App. 131. We thus reject the defendant's argument that the jury instructions were improper because they omitted an element of mens rea.

The fact that the penalty for violation of § 54-257 results in further incarceration for the defendant does not discourage us from ruling that the statute imposes strict liability. "Neither the United States Supreme Court nor [this court] has held that the magnitude of the penalty determines the constitutionality of strict liability statutes." *State* v. *Nanowski*, 56 Conn. App. 649, 656–57, 746 A.2d 177 (rejecting defendant's argument that General Statutes § 31-71a et seq. regarding payment of wages was unconstitutional as strict liability offense where amendments to statute increased penalty for conviction from misdemeanor to felony), cert. denied, 252 Conn. 952, 749 A.2d 1203 (2000); see *State* v. *Kirk R.*, 271 Conn. 499, 515 n.20, 857 A.2d 908 (2004) (noting that crime of sexual assault in first degree, found in § 53a-70, is strict liability crime, which does not require state to prove actor's knowledge or intent as element of offense); *State* v. *Merdinger*, 37 Conn. App. 379, 382–86 and 386 n.4, 655 A.2d 1167 (public welfare offense of nonpayment of wages did not require mens rea and imposed strict criminal liability where defendant was sentenced to 240 days in jail suspended after ninety days and fined $8000), cert. denied, 233 Conn. 914, 659 A.2d 187 (1995); see also *State* v. *Wilson*, 83 Conn. App. 67, 69–72, 848 A.2d 542 (refusing to depart from precedent established in *Merdinger* and *Nanowski* that failure to pay wages is strict liability crime), cert. denied, 270 Conn. 913, 853 A.2d 529 (2004).

Because we conclude that the statutes in question impose strict liability, it follows that the trial court was not required to include a mens rea element in its jury charge. An examination of the entire jury charge reveals that each element of the crime as set forth in §§ 54-251 and 54-257 was presented to the jury. The charge outlined the elements of the statute, stating that "it shall be a crime if the registrant fails to return the address verification form as required." Because the trial court's charge correctly conveyed the elements of the offense, it is not reasonably possible that the jury was misled.

## B

The defendant also claims that the trial court improperly failed to instruct the jury that the state must prove that the defendant had a duty to return the address verification forms and that he actually knew of this duty as elements of a violation of § 54-257.[22] On the basis of our conclusion that § 54-257 is a strict liability

---

[22] The defendant cites *Lambert* v. *California*, 355 U.S. 225, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957), in support of this claim. We, however, find *Lambert* to be inapposite. In *Lambert*, the defendant was arrested under a Los Angeles general municipal ordinance requiring registration of convicted felons if they remained in the city for more than five days. Id., 226. When the defendant was arrested on "suspicion of another offense," the police discovered that the defendant had been a resident of Los Angeles for more than seven years and, within that period, had been convicted of a felony offense, but had not registered with the chief of police, as required under the municipal code. Id. Consequently, the defendant was convicted of failing to register in violation of the municipal ordinance. Id., 227. The defendant appealed her conviction to the United States Supreme Court, claiming that the municipal ordinance, as applied, denied her due process of law. Id., 226–27. The Supreme Court held that the defendant's conviction violated the due process provisions of the fourteenth amendment because her conduct in failing to register was "wholly passive" and because "circumstances which might move one to inquire as to the necessity of registration [were] completely lacking." Id., 228–29. The court ruled that due process requires "actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply . . . ." Id., 229. Unlike the defendant in *Lambert*, the defendant in the present case had ample notice of his registration requirements, as we have discussed previously.

statute, we conclude that actual notice to the defendant is not an element of § 54-257, and that the trial court's instructions were not constitutionally deficient.

The judgment is reversed and the case is remanded for a new trial.

In this opinion ROGERS, C. J., and KATZ, PALMER and ZARELLA, Js., concurred.

SCHALLER, J., dissenting, with whom NORCOTT, J., joins.

The majority reverses the conviction of the defendant, T.R.D., on the ground that the trial court failed to canvass him adequately with respect to his waiver of trial counsel and his decision to represent himself. The sole inadequacy that the majority identifies is that the trial court did not advise the defendant of the range of possible penalties that he would face upon conviction. Relying principally on our decision in *State* v. *Diaz*, 274 Conn. 818, 878 A.2d 1078 (2005), the majority determines that the waiver was not knowing, intelligent and voluntary because the omission of information as to the range of penalties, in and of itself, amounts to a violation of the defendant's sixth amendment right to counsel. In other words, in the majority's view, the trial court's omission, in canvassing the defendant, of one factor enumerated in Practice Book § 44-3, rendered the defendant's waiver of counsel not knowing, intelligent and voluntary and, as a result, the trial court's decision to accept that invalid waiver deprived the defendant of his sixth amendment right to counsel.

I respectfully dissent from the majority opinion because, in my view, the canvass as a whole complied with the constitutional standard that we previously have enunciated in *State* v. *Diaz*, supra, 274 Conn. 829–30, and *State* v. *Day*, 233 Conn. 813, 821–23, 661 A.2d 539

(1995). Viewed in its entirety, the canvass left no doubt that the defendant's waiver was knowing, intelligent and voluntary. It is undisputed that the trial court did not advise the defendant of the range of possible penalties, as specified in Practice Book § 44-3 (3), which, in this instance, was a sentence of one to five years of incarceration. I would not disagree with the proposition that the trial court should have included the possible penalties in the canvass. As the majority recognizes, however, the defendant does not have a constitutional right to a specifically formulated canvass to accomplish the purposes of the § 44-3 inquiry.

In this regard, it is worth repeating the applicable standard from *Diaz*. "The defendant . . . does not possess a constitutional right to a specifically formulated canvass [with respect to this inquiry]. His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish that the defendant's waiver was voluntary and knowing. . . . *In other words, the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in . . . § [44-3] if the record is sufficient to establish that the waiver is voluntary and knowing.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Diaz*, supra, 274 Conn. 831; see also *State* v. *D'Antonio*, 274 Conn. 658, 709, 877 A.2d 696 (2005) ("[r]ecognizing the constitutional implications attendant to . . . review [under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)], we do not review the proceedings for strict compliance with the prophylactic rule of Practice Book § 44-3, but rather for evidence that the waiver of counsel was made knowledgeably and voluntarily").

This leads to my first point of disagreement with the majority's analysis. While accurately reciting the constitutional standard from *Diaz*, the majority accepts the defendant's argument that "the trial court's canvass

was constitutionally insufficient because the defendant was never made aware of the range of punishments that he could face upon conviction." The majority refers to *Diaz* as follows: "[W]e were not persuaded that the imprecise language used by the trial court was sufficient to satisfy the constitutional requirement that the defendant be advised of the range of permissible punishments he faced upon conviction . . . . *Diaz* controls the resolution of this issue in the present case." (Citation omitted.) The majority goes on to apply the reasoning of *Diaz* to the present case by indicating that "there is simply no evidence present in the record from which we could infer that the defendant had any meaningful appreciation of the period of incarceration he faced if convicted of the charges he faced." Based on this factor alone, the majority concludes that the trial court's failure to conduct an adequate canvass rendered the defendant's waiver of counsel invalid because it was not knowing, intelligent and voluntary, and that the defendant is entitled to a new trial.

The proper standard to use, I submit, is whether a review of the record of the entire canvass demonstrates that the waiver was knowing, intelligent and voluntary. Since a defendant has no constitutional right to any particular question or series of questions, notwithstanding the guidelines of Practice Book § 44-3, we must not base our determination on the absence of a single factor. In *State* v. *Day*, supra, 233 Conn. 822, this court elaborated on the reason why the test for waiver of the right to counsel "cannot be construed to require anything more . . . than is constitutionally mandated . . . ." (Internal quotation marks omitted.) "[S]uch a waiver triggers the constitutional right of an accused to represent himself. . . . The multifactor analysis of § [44-3], therefore, is designed to assist the court in answering two fundamental questions: first, whether a criminal defendant is minimally competent to make the

decision to waive counsel, and second, whether the defendant actually made that decision in a knowing, voluntary and intelligent fashion." (Citations omitted; internal quotation marks omitted.) Id. Put another way, this court, in cautioning that the right to counsel not be construed to require more than is constitutionally mandated, recognized that there are two constitutional rights at issue in the review of a waiver canvass—both the right to counsel and the right to self-representation. These two rights exist in inherent tension with each other, and we have recognized that "[w]hen the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins." (Internal quotation marks omitted.) Id., 821.

This brings me logically to the second basis for my disagreement. The record of the canvass in this case provides ample support for my conclusion that the defendant's waiver was knowing, voluntary and intelligent, despite the omission in the canvass of specific information concerning the possible sentence. The canvass, which is recited by the majority,[1] reveals that the defendant was adamant about discharging his attorney and exercising his constitutional right to represent himself at trial and that he appreciated the problems inherent in doing so. Although the court repeatedly warned the defendant of the dangers of self-representation, even advising the defendant that it would be unwise to do so, the defendant persisted in stating his desire to take the risks of proceeding on his own. Despite many additional opportunities for assistance offered by the court during trial, the defendant persisted in exercising his constitutional right of self-representation throughout the trial.

The record in the present case stands in sharp contrast to that presented in *Diaz*. The record reflects the

---

[1] See footnotes 11 and 12 of the majority opinion.

fact that the defendant had counsel, Attorney Christopher Sheehan, for approximately sixteen months prior to the trial. The defendant in *Diaz*, in contrast, "was represented by counsel only briefly and never, insofar as the record reflects, in connection with the narcotics charges except for bond purposes only." *State* v. *Diaz*, supra, 274 Conn. 832 n.14. We specifically noted in *Diaz* that, although the record in that case did not "support a presumption that the defendant had been apprised by counsel of the range of possible penalties that he faced if convicted . . . the existence of certain facts might give rise to such a presumption in another case . . . ." Id. Despite disagreements between the defendant and his counsel, and despite the defendant's ultimate decision to proceed without Sheehan, I submit that in the present case, we may presume that, at some point in their discussions, Sheehan made the defendant aware of the possible penalties. See, e.g., *State* v. *Caracoglia*, 95 Conn. App. 95, 113, 895 A.2d 810 ("[i]n general, a trial court may appropriately presume that defense counsel has explained the nature of the offense in sufficient detail" [internal quotation marks omitted]), cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006); see also *State* v. *Wolff*, 237 Conn. 633, 658–59, 678 A.2d 1369 (1996) (relying on fact that defendant was represented by counsel for four months during proceedings in concluding that the "record is sufficient to support the presumption that the defendant's counsel . . . had explained to him the nature of the offenses in sufficient detail"). Even though the defendant complained about a lack of communication from Sheehan, the record indicates that the dispute between the defendant and Sheehan appeared to involve mainly disagreement over trial strategy. In addition, the defendant had prior criminal convictions and was aware that a conviction for failure to register as a sex offender and to verify his address in violation of General Statutes (Rev. to 2003) § 54-251

and General Statutes § 54-257 would be a class D felony. See General Statutes (Rev. to 2003) § 54-251 (e).

The defendant, like the defendant in *State* v. *Day*, supra, 233 Conn. 829–30, "made his position abundantly clear that he would rather risk self-representation than proceed to trial [with his counsel]." In the face of such adamant refusal of representation, courts have recognized that "the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly." (Internal quotation marks omitted.) *State* v. *Varszegi*, 36 Conn. App. 680, 684–85, 653 A.2d 201 (1995), aff'd, 236 Conn. 266, 673 A.2d 90 (1996), quoting *Faretta* v. *California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). "As long as the defendant clearly and unequivocally indicates that he wants to proceed pro se instead of proceeding [with his counsel], his waiver of counsel is knowing and voluntary." (Internal quotation marks omitted.) *State* v. *D'Antonio*, supra, 274 Conn. 718. Unlike the facts in *Diaz*, the facts in the present case indicate that specific knowledge of the relatively modest possible sentence was not a critical factor. Although the defendant faced the complexities of representing himself, about which the trial court warned him repeatedly, he did not face a sentence of magnitude, which was an important point in *Diaz*.

After clarifying the constitutional standard, the court in *Diaz* focused on the trial court's failure to inform the defendant about the potential penalties that he would face if he were convicted. The significance of the possible sentences in *Diaz*, however, was notably different from that in the present case. The defendant in *Diaz* faced a sentence of nearly fifty years. After his trial, he received a total effective sentence of forty-three years imprisonment.[2] By contrast, in the present

---

[2] In *Diaz*, the trial court imposed the total effective sentence of forty-three years imprisonment following the defendant's conviction of two counts of possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b), two counts of possession of narcotics in violation of General

case, the maximum sentence is five years.[3] See General Statutes § 53a-35a (7). Although the trial court in *Diaz* warned the defendant that the charges were " 'very substantial' " and that the cases were " 'big prison time cases' "; *State* v. *Diaz*, supra, 274 Conn. 832; the defendant was not given more specific information. The fact that the court in *Diaz* concluded that, under those particular circumstances, the defendant did not receive "a realistic picture from [the court] regarding the *magnitude* of his decision [to proceed to trial without counsel]"; (emphasis added) id., 833; by no means controls the present case, which involves vastly different circumstances.

It is noteworthy, as well, that the decision in *Diaz* did not turn simply on the failure to inform the defendant of one factor of § 44-3. The decision turned on the constitutional significance of the *magnitude* of the possible sentence in the overall picture. In *Diaz*, the court stated clearly that the defendant did not have the constitutional right to be questioned on each and every factor in § 44-3. Id., 831. Because of the "true magnitude" of the consequences, of which the defendant was not informed, however, the canvass as a whole did not pass constitutional muster. The application of the constitutional standard in *Diaz* does not govern the present case, in which the possible sentence factor was proportionately less significant in the overall picture. The majority's interpretation of the significance of *Diaz* would shift the well established focus of this constitutional inquiry. Reviewing courts would be led to focus on whether a single factor was omitted, rather than determining whether the canvass as a whole established

Statutes § 21a-279 (a), and one count of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). *State* v. *Diaz*, supra, 274 Conn. 819.

[3] The defendant was sentenced to three years imprisonment, execution suspended after one year, and five years probation.

that the waiver was knowing, intelligent and voluntary. Changing the focus in this way would not take proper account of the fact that, in deciding to represent himself, a defendant is exchanging one constitutional right for another.

As this court stated in *State* v. *Day*, supra, 233 Conn. 828, our inquiry, in determining whether a canvass sufficiently assured that a defendant's choice to forego his right to counsel and to elect his right to self-representation was made knowingly, intelligently and voluntarily, is aimed at discerning whether "the defendant knew what he [was] doing and his choice [was] made with eyes open. *Faretta* v. *California*, supra, [422 U.S. 835], citing *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, [87 L. Ed. 268] (1942)." (Internal quotation marks omitted.) "When a defendant is faced with the choice of proceeding with counsel he is not entirely happy with or defending pro se, the trial judge must satisfy himself that if the defendant chooses to proceed pro se, he does so knowingly, with a full understanding of the risks involved. . . . This requirement, in effect, simply restates the rule that a waiver of the right to counsel must be clear and unequivocal. *Faretta* v. *California*, supra, [835] . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Day*, supra, 829–30.

Given the full context of the canvass in this case, the defendant's prior experience with the criminal justice system, and his lengthy attorney-client relationship with Sheehan, the trial court's omission of the factor concerning the possible sentence did not amount to a constitutional violation. To the contrary, the record indicates that the defendant's waiver of his right to counsel, and his determination to exercise his right to represent himself, was knowing, intelligent and voluntary.