******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE DANIEL A., JR.*
(AC 36068)

Gruendel, Beach and Schaller, Js.

*Argued February 19—officially released April 23, 2014***

(Appeal from Superior Court, judicial district of New Haven, Juvenile Matters, Brown, J.)

*David B. Rozwaski*, assigned counsel, for the appellant (respondent father).

*Renee Bevacqua Bollier*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon* and *Susan T. Pearlman*, assistant attorneys general, for the appellee (petitioner).

*Michael D. Day*, for the appellee (respondent mother).

*Opinion*

SCHALLER, J. The respondent father, Daniel A., appeals from the judgment of the trial court terminating his parental rights with respect to his minor child, Daniel A., Jr.[1] On appeal, the respondent claims that the court improperly (1) failed to conduct an adequate canvass with respect to his election to represent himself during trial, thereby depriving him of his right to counsel, and (2) terminated his parental rights pursuant to General Statutes § 17a-112 (j). We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. In January, 2011, the respondent and the mother left the child, who was less than one year old at the time, at the home of his paternal grandparents' (grandparents) without notifying the grandparents where they were going or when they would return. With the whereabouts of both the respondent and the mother unknown, the petitioner, the Commissioner of Children and Families (commissioner), filed an order of temporary custody and a petition of neglect with respect to the child. In March, 2011, the child was adjudicated neglected and committed to the care of the commissioner. On the same date, the court ordered final specific steps for the respondent and the mother to regain custody of the child. It furthered ordered the grandparents licensed as relative foster parents for the child. The location of the respondent and the mother was unknown during all of the foregoing proceedings. Their whereabouts remained unknown until April, 2011, when the mother informed the commissioner that the respondent had been arrested and incarcerated on criminal charges. The mother was later arrested in June, 2011, on criminal charges.

On January 5, 2012, the commissioner filed a petition to terminate the parental rights of both the respondent and the mother. With respect to the respondent, the commissioner alleged that his parental rights should be terminated on the ground that he "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [he] could assume a responsible position in the life of the child." General Statutes § 17a-112 (j) (3) (B). The trial encompassed eleven days over the eight month period beginning in September, 2012 and ending in May, 2013. The respondent was incarcerated for a majority of the trial.[2] In addition, with the exception of the first day of trial, the respondent represented himself at trial. Following the trial, in a comprehensive memorandum of decision, the court granted the commissioner's petition, thereby terminating the parental rights of both the respondent and the mother.

In its decision, the court found, as required by § 17a-

112 (j) (1),[3] that the Department of Children and Families (department) made reasonable efforts to reunify both parents with the child and that both parents were either unable or unwilling to benefit from such reunification efforts. With respect to the respondent's parental rights, the court found that he had failed to achieve a sufficient degree of personal rehabilitation. See General Statutes § 17a-112 (j) (3).[4] The court also found that the termination of his parental rights was in the best interests of the child. See General Statutes § 17a-112 (j) (2).[5] Pursuant to § 17a-112 (k),[6] the court detailed its findings with respect to both parents and concluded that the parental rights of both the respondent and the mother should be terminated. Accordingly, the court granted the petition. This appeal followed. Additional facts will be set forth as necessary.

I

The respondent first claims that the court improperly failed to conduct an adequate canvass with respect to his election to represent himself, thereby depriving him of his right to counsel. Specifically, the respondent contends that the court failed to advise him of his right to counsel, inter alia, at the time he was considering self-representation. As a result of this purported failure, the respondent further contends that his election to represent himself was not accompanied by an intelligent and voluntary waiver of his right to counsel. According to the respondent, because his waiver of counsel was neither intelligent nor voluntary, he was deprived of his right to counsel.[7] We disagree.

We begin our analysis by setting forth the governing legal principles regarding the right to counsel, self-representation, and waiver in the context of a termination of parental rights proceeding. It is well settled that a parent confronted with the termination of his or her parental rights is guaranteed the right to the assistance of counsel by virtue of General Statutes § 46b-135 (b), which provides that "[a]t the commencement of any proceeding on behalf of" a neglected or uncared-for child, the parents of the child "shall have the right to counsel" and, if required due to indigency, counsel shall be provided for them.[8] See General Statutes §§ 45a-717 (b) and 46b-136 (recognizing parent's right to counsel in termination proceedings); see also *In re Samantha C.*, 268 Conn. 614, 663–64, 847 A.2d 883 (2004) (appointment of counsel to indigent parents in termination proceedings required by statute); *In re Zowie N.*, 135 Conn. App. 470, 479–80, 41 A.3d 1056 (same), cert. denied, 305 Conn. 916, 46 A.3d 170 (2012).

Our law further recognizes the possibility that a parent may waive his or her statutory right to counsel in favor of representing him or her self. See General Statutes § 45a-717 (b);[9] see also *In re Zowie N.*, supra, 135 Conn. App. 483–85. In the criminal context, which both our Supreme Court and this court previously have uti-

lized as persuasive authority in addressing similar matters,[10] a defendant who elects to represent himself "relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to [exercise the right to self-representation, one] must knowingly and intelligently [forgo] those relinquished benefits." *State* v. *Flanagan*, 293 Conn. 406, 418–19, 978 A.2d 64 (2009). This is so because "[t]he right to counsel and the right to self-representation present mutually exclusive alternatives. . . . [T]he two rights cannot be exercised simultaneously. . . . [One] properly exercises his [or her] right to self-representation by knowingly and intelligently waiving his [or her] right to representation by counsel." Id., 418.

Waiver, of course, is the intentional relinquishment of a known right. *In re Baby Girl B.*, 224 Conn. 263, 296–97, 618 A.2d 1 (1992). "[A] proper waiver of counsel must be intelligent and voluntary and . . . its basis, having been clearly determined by the trial court, should appear on the record." (Internal quotation marks omitted.) *In re Manuel R.*, 207 Conn. 725, 736–37, 543 A.2d 719 (1988).

A

At the threshold of the respondent's claim is his contention that the court was required to conduct a specific canvass akin to the criteria set forth in Practice Book § 44-3, which governs a criminal defendant's exercise of the right to self-representation and corresponding waiver of the right to counsel.[11] Specifically, he contends that the court was required, but failed to (1) apprise him of his right to counsel, (2) determine whether he appreciated the consequences of self-representation, (3) determine whether he comprehended the nature of the proceedings, and (4) apprise him of the dangers and disadvantages of self-representation. We are not persuaded.

"The interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation. . . . The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary." (Citations omitted; internal quotation marks omitted.) *Wiseman* v. *Armstrong*, 295 Conn. 94, 99, 989 A.2d 1027 (2010).

Practice Book § 44-3 "was adopted in order to implement *the right of a defendant in a criminal case* to act as his own attorney . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Flanagan*, supra, 293 Conn. 419. The respondent does not direct us to any authority indicating that the statutory right to counsel in termination proceedings carries with it a corresponding *right* to self-representation. Nor does he provide any support for the assertion that § 44-3 extends beyond its

plain confinement to criminal proceedings. In addition, we note that § 44-3 does not require a specific canvass, as "the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in Practice Book § [44-3] if the record is sufficient to establish that the waiver is voluntary and knowing." (Internal quotation marks omitted.) *State* v. *T.R.D.*, 286 Conn. 191, 204, 942 A.2d 1000 (2008). Thus, even if we were to embrace the notion that a court in a termination proceeding is required to conduct a canvass pursuant to § 44-3, which we do not, the purported waiver of a criminal defendant's constitutional right to counsel does not precipitate "a constitutional right to a specifically formulated canvass." *State* v. *Webb*, 238 Conn. 389, 429, 680 A.2d 147 (1996). A fortiori, we cannot conclude that the purported waiver of a parent's statutory right to counsel triggers such a canvass absent express language to that effect in the statutory scheme governing termination proceedings.

This is not to say, however, that a court is without an obligation to determine whether a parent has intelligently and voluntarily waived the right to counsel in favor of self-representation. "[T]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . This important decision rests within the discretion of the trial judge. . . . Our task, therefore, is to determine whether the court abused its discretion in allowing the defendant to discharge his counsel and to represent himself." (Internal quotation marks omitted.) *State* v. *Coleman*, 83 Conn. App. 672, 685, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 16 L. Ed. 2d 1091 (2005).

B

At the heart of the respondent's claim is his contention that the court improperly determined that his election to represent himself and waive his right to counsel was intelligent and voluntary. We are not persuaded.

To the extent that the court permitted the respondent to represent himself, it necessarily determined that he intelligently and voluntarily elected to do so. We review the latter determination for an abuse of discretion. See *State* v. *T.R.D.*, supra, 286 Conn. 202 ("[w]e review [a] trial court's determination with respect to whether [a criminal] defendant knowingly and voluntarily elected to proceed pro se for abuse of discretion" [internal quotation marks omitted]).

This court previously has set forth what is required to support an effective waiver of the statutory right to counsel in a termination proceeding by way of analogy

to the criminal context: "[A]lthough a defendant need not have the skill and expertise of an attorney to competently and intelligently choose [self-representation], a record that affirmatively shows that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver [of counsel]." (Internal quotation marks omitted.) *In re Zowie N.*, supra, 135 Conn. App. 483; accord *State* v. *Flanagan*, supra, 293 Conn. 419. Accordingly, we must determine whether the record supports the court's determination that the respondent intelligently and voluntarily elected to represent himself, thereby waiving his statutory right to counsel.

The following additional facts and procedural history inform our review. On February 23, 2012, the court set a trial date in the underlying matter. At that time, the respondent was represented by his first appointed counsel. Thereafter, on July 24, 2012, the respondent's counsel moved to withdraw on the basis that the respondent no longer desired his representation. The court denied the motion and asked both counsel and the respondent to reassess the situation, which the court would reconsider at the next hearing. At the next hearing, on August 14, 2012, both the respondent and his counsel informed the court that their relationship was irretrievably broken. On the same date, the court granted the motion to withdraw and appointed the respondent new counsel. The matter then proceeded to trial as scheduled.

On the first day of trial, September 6, 2012, the commissioner's case-in-chief commenced. Neither the respondent nor his counsel indicated any issues regarding representation to the court. On the second day of trial, September 18, 2012, the respondent's counsel informed the court that there was an irretrievable breakdown in the attorney-client relationship. The respondent, addressing the court, stated that "a serious conflict of interest" existed with his counsel. When the court inquired whether this situation had just arisen, the respondent's counsel answered in the affirmative. The court ordered a short recess so that counsel could confer with the respondent. Following the recess, the respondent's counsel stated: "[A]pparently we have irreconcilable differences with regard to the defense of this case, and [the respondent] believes that he would be better off serving himself or without me, whichever." The respondent's counsel again confirmed to the court that this situation had arisen that day. Thereafter, the following colloquy occurred:

"[The Respondent]: Actually, Your Honor, [the situation] started on our last court date but [respondent's counsel] didn't come out to talk to me . . . they rushed me right out of the building so I couldn't address it at that time, so this is the first time. . . . I put in for a legal call to the facility. They never called me in. I would have called him ahead of time with it but there's a

process that I have to go with . . . [because I am] incarcerated . . . . It gets to be tough sometimes, so I would have [called him ahead of time] if I had a chance to, but the counselors [at the correctional facility], you know, do the best they can do.

"The Court: So you're asking for another attorney?

"[The Respondent]: It'd be nice, yes. Your honor, [counsel and I] agreed when he came up to visit me . . . at the [correctional] facility, and I showed him paperwork that I have with me now that's in direct contradiction to what's in this [petition for termination of parental rights] and what's been testified to. . . . I asked him to pursue it [during cross examination of the commissioner's witness]. He took it upon himself to totally not do it, deeming it irrelevant, but whatever, [he told] me one thing coming here, [but chose] to do another [thing].

"The Court: Okay. . . here's the situation: it's up to [your counsel] to determine what type of trial strategy to employ because . . . he is the individual who has reviewed the facts in your case, reviewed the evidence that the state had offered or intends on offering, and is acting zealously to represent your interests in this matter. . . . [A]s far as the court's concerned, for the first time this has been brought to the court's attention . . . ."

The court then confirmed that the respondent's counsel was moving to withdraw. After hearing from all of the parties on the motion to withdraw,[12] the following colloquy occurred:

"The Court: If I deny the request to appoint new counsel, would you still be asking for [counsel] to be taken off the case and you represent yourself?

"[The Respondent]: Yeah. I mean, he's not going to do anything. I don't trust him anymore. Once we went down there and he refused to ask these questions and do anything, I [am left to believe] he's siding with them, the other state employees . . . there's a conspiracy going on and they're conspiring together . . . to not . . . ask these questions.

"The Court: So the answer to my question is . . . if I grant the motion to withdraw as counsel, I do not have any intention of appointing a third attorney. So are you prepared to represent yourself in this matter?

"[The Respondent]: Would I be able to use [the mother's] attorney just for asking certain questions?

"The Court: No.

"[The Respondent]: All right, then I'll do . . . .

"The Court: I'll tell you . . . .

"[The Respondent]: Then I'll represent myself. Okay.

"The Court: I'll tell you what I will do. For the balance

of the day I will instruct [counsel] to remain; you're representing yourself. . . . If you want to turn to him and ask him something, I'll allow you to do that."

The respondent then inquired how, in light of his incarceration, he should perform certain tasks related to his self-representation.

"The Court: You will . . . have to make your requests to the court and . . . the clerk's office, and we'll assist you in any way that we can. My advice would be to continue to work with [counsel], but you've indicated to me that is something you cannot do. Am I right about that?

"[The Respondent]: Yeah. I have no faith in him and no trust in him at all and this is . . . probably the most important case in my life because it has to do with my son.

"The Court: Okay . . . . So I am going to grant the motion for [respondent's counsel] to withdraw. . . . I have indicated that counsel should remain in the court-room, and if [the respondent] wishes to ask you a question and you can help him out, do so. . . . Before you leave today we will give you, [respondent], a copy of an appearance form so that you'll be acting on your own behalf in this matter, and you will be expected to comport yourself appropriate with regard to procedures. Anything you need to do, if there's something you need to file, objections you need to make, that's something that you will need to do. And I do this because this is the second time now that a request has been made to have new counsel appointed. So that's how we are going to proceed."

When the trial continued, the commissioner's case-in-chief resumed with the presentation of a witness for testimony. During the respondent's cross-examination of the commissioner's witness, he attempted to elicit testimony that was potentially incriminating against him. The court interjected, reminding the respondent that he "has a right to remain silent. Anything you say can and will be used against you. You do have a right to be represented by an attorney with regard to any criminal issues. We've already covered the issue with regard to this trial." The respondent did not indicate that he desired counsel and continued on his own behalf for the remainder of the day's testimony. Prior to adjourning for the day, the court paused to inform the respondent of the posture of the case. The court notified the parties that it would be scheduling the next trial date as to provide the respondent with an opportunity to review certain documents. In addition, the court detailed for the respondent the arrangements it had made for him to work with the clerk's office. The court concluded by asking the respondent whether he wanted his standby counsel present for the remainder of trial. The respondent responded: "Yeah, he can stay on. Yes,

please." Thereafter, the court adjourned for the day. The respondent represented himself for the remainder of trial with standby counsel available to him.

On the basis of the foregoing, it is evident that the court, on the second day of trial, was confronted with a motion from the respondent's counsel to withdraw and a request from the respondent himself for substitute counsel. The respondent continually insisted that his appointed counsel withdraw in the face of ample warnings from the court that it would not provide him with substitute counsel. In addition, the respondent initially associated his counsel's withdrawal as something that would precipitate his self-representation.[13] When confronted with the choice of retaining appointed counsel and self-representation, the respondent elected the latter. His election was therefore voluntary unless it resulted from an antecedent deprivation of his statutory right to appointed counsel. See, e.g., *McKee* v. *Harris*, 649 F.2d 927, 931 (2d Cir. 1981) ("the very essence of a voluntary waiver is that it be the product of a free and meaningful choice"), cert. denied, 456 U.S. 917, 102 S. Ct. 1773, 72 L. Ed. 2d 177 (1982).

The record also indicates that the trial judge was familiar with the respondent as a result of presiding over four previous proceedings in the underlying termination case. At least two of these proceedings involved a disagreement between the respondent and his first appointed counsel concerning representation. Moreover, the respondent demonstrated a general understanding of legal proceedings and trial tactics prior to counsel's withdrawal and his self-representation. Specifically, the respondent indicated that he had drafted and delivered to counsel a list of witnesses before the second day of trial, made suggestions to counsel regarding cross-examination tactics on the first day of trial, asked practical questions regarding filings and motions to the court directly, and demonstrated a familiarity with particular allegations in the petition to terminate his parental rights. Finally, the record indicates that the respondent understood the gravity of the proceedings. When the court inquired whether his position was that he could no longer retain appointed counsel, having already been informed he would have to represent himself if appointed counsel were to withdraw, he responded: "Yeah. I have no faith in him and no trust in him at all and this is . . . probably the most important case in my life because it has to do with my son."

Under these circumstances, we conclude that there is ample support in the record for the court's determination that the respondent intelligently and voluntarily elected to represent himself, thereby waiving his statutory right to counsel. Although the record indicates that the respondent did not state, in so many words, that he no longer desired counsel, he engaged in a course

of conduct that demonstrated that he "knew what he [was] doing and [that] his choice [was] made with eyes open . . . ." (Internal quotation marks omitted.) *State* v. *T.R.D.*, supra, 286 Conn. 206. The respondent did not equivocate in his insistence that his appointed counsel withdraw, notwithstanding the express warnings from the court that substitute counsel would not be forthcoming and that he would have to represent himself. With respect to substitute counsel, the statutory right to counsel in termination proceedings does not encompass an unbridled right to counsel of one's choice. *In re Elysa D.*, 116 Conn. App. 254, 262 n.9, 974 A.2d 834, cert. denied, 293 Conn. 936, 981 A.2d 1079 (2009). Absent a showing of good cause, the substitution of counsel is not warranted. Id. The court, faced with a motion to withdraw and request for substitute counsel on the second day of trial, inquired into the circumstances of the respondent's representation. Having determined that he was not entitled to substitute counsel,[14] a determination that the respondent does not challenge on appeal, the court properly presented the respondent with the choice of retaining counsel or representing himself for the remainder of trial. In the criminal context, our Supreme Court has determined that a trial court, having first made inquiries as to the defendant's choice of representation, may "properly insist that the defendant choose between representation by his existing counsel and [self-representation]" in the interests of orderly procedure. (Internal quotation marks omitted.) *State* v. *Gethers*, 197 Conn. 369, 380, 497 A.2d 408 (1985).

In sum, the record unequivocally demonstrates that the respondent comprehended that substitute counsel would not be appointed upon the withdrawal of his appointed counsel. The respondent nevertheless insisted on counsel's withdrawal and understood this was functionally equivalent to an election to represent himself. Accordingly, we conclude that the court did not abuse its discretion in permitting the respondent to represent himself and waive his statutory right to counsel.

## II

The respondent next claims that the court improperly terminated his parental rights. Specifically, he contends that the record does not support the court's findings that (1) he was either unwilling or unable to benefit from reunification efforts, (2) he had failed to rehabilitate himself, and (3) it was in the best interests of the child to grant the petition for termination of parental rights. In response, the commissioner argues that the respondent's first contention is moot and, therefore, not subject to appellate review. As to the respondent's second and third contentions, the commissioner argues that the court's findings are amply supported by the record. We agree with the commissioner.

Before addressing the respondent's claim, however, we note that a "hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights . . . exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child. In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in . . . § [17a-112 (k)] . . . ." (Internal quotation marks omitted.) *In re Alison M.*, 127 Conn. App. 197, 203–204, 15 A.3d 194 (2011).

A

The respondent first contends that the court's finding in the adjudicatory phase of the proceeding that he was unable or unwilling to benefit from reunification efforts was clearly erroneous. The commissioner, in response, argues that this contention is moot and not subject to appellate review. We agree with the commissioner.

Before a court may grant a petition for termination of parental rights, it must find, by clear and convincing evidence, "that . . . the [department] has made reasonable efforts to locate the parent and reunify the child with the parent in accordance with subsection (a) of section 17a-111b, *unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts* . . . ." (Emphasis added.) General Statutes § 17a-112 (j) (1). Our Supreme Court has determined that the language of § 17a-112 (j) (1) requires the commissioner to "prove either that [the department] has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts." (Emphasis omitted.) *In re Jorden R.*, 293 Conn. 539, 552, 979 A.2d 469 (2009). "[E]ither finding, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1)." Id., 556.

In the present case, the court found by clear and convincing evidence that the department (1) "made reasonable efforts to reunify the parents with the son," *and* (2) "that the parents are either unable or unwilling to benefit from reunification efforts." The respondent challenges only the court's second finding on appeal. To the extent that the court's first finding provides an independent basis for satisfying § 17a-112 (j) (1), our review of the respondent's challenge with respect to the court's second finding could not result in any practical relief and is, therefore, moot. See *In re Jorden R.*, supra, 293 Conn. 556 ("[i]t is not the province of appellate

courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow" [emphasis omitted; internal quotation marks omitted]); *In re Alison M.*, supra, 127 Conn. App. 206 (same). Accordingly, we decline to review the respondent's first contention.

B

The respondent's second contention is directed at the court's finding in the adjudicatory phase of the proceeding that he had failed to rehabilitate himself to such a degree that in the foreseeable future, he would be in a position to adequately provide for his child. The respondent contends that this finding was clearly erroneous. We disagree.

In addition to finding that the commissioner has established by clear and convincing evidence the reunification requirements of § 17a-112 (j) (1), a court must determine whether a statutory ground for termination exists in accordance with § 17a-112 (j) (3) before it may grant a petition for termination of parental rights. In the present case, the court found by clear and convincing evidence that the father had failed to rehabilitate himself pursuant to § 17a-112 (j) (3) (B) (i), which provides, in relevant part, "the child has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." See *In re Elvin G.*, 310 Conn. 485, 503, 78 A.3d 797 (2013).

The respondent focuses his contention on the personal rehabilitation requirement of § 17a-112 (j) (3) (B) (i). This court previously has recognized that "[p]ersonal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [T]he court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child . . . at issue." (Citations omitted; internal quotation marks omitted.) *In re Alison M.*, supra, 127 Conn. App. 206–207.

In addition, we set forth our standard of review. "On appeal, we review a trial court's finding that a parent has failed to rehabilitate [himself] in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole

record. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) Id., 207. "It is axiomatic that a trial court's factual findings are accorded great deference. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) *In re Jorden R.*, supra, 293 Conn. 558.

In the present case, the respondent contends that the only evidence the court relied on in finding that he had failed to rehabilitate pursuant to § 17a-112 (j) (3) (B) (i) was the testimony of Nancy Randall, a psychiatrist who evaluated the respondent in connection with the termination proceeding. He directs our attention to Randall's testimony during trial that reunification of the child with the respondent was conceivable, but that it would likely have to occur at least one year following the respondent's release from prison as to allow time for him to demonstrate sobriety, stable housing, employment, and law-abiding behavior. Insofar as Randall suggested that reunification may be conceivable on the basis of her understanding that the respondent would be incarcerated for several years, he contends that his March, 2013 parole, which occurred several months after Randall's testimony, was an unforeseen contingency that may have altered her recommendation as to reunification. In addition, the respondent contends that there is scant evidence to support the finding that he failed to rehabilitate or, alternatively, that there was no basis in the record for denying him additional time to do so. He specifically asserts that the "evidence is to the contrary," and that he is "committed to improving his situation so that he can be a responsible parental figure." In support of this assertion, the respondent cites his efforts to obtain employment and maintain housing, as well as his consistent visitation with the child.

We fail to perceive how any of these assertions demonstrate that the court's finding that the respondent had failed to rehabilitate is clearly erroneous. The record demonstrates that the court expressly predicated its finding not only on the testimony of Randall, but her written report made in connection with her psychological evaluation of the respondent, the mother, the child, and the paternal grandparents. Notwithstanding this additional evidence, even if we were to assume, arguendo, that the court relied solely on Randall's testimony, the record reveals that she was expressly asked to opine on the respondent's ability to care for the child on the assumption that the respondent would be released from incarceration in early 2013. She testified

that the prognosis was poor, as she did in her written report. In addition, the court expressly considered the fact that the respondent was paroled in March, 2013, as well as the evidence demonstrating the respondent's efforts to rehabilitate. Specifically, the court acknowledged that the respondent "certainly availed himself of a variety of services, both before, during, and *after his incarceration*. As the evidence offered at trial indicates, including exhibits offered by [the respondent] himself, his efforts to maintain his sobriety and compliance with treatment has not always been successful. He has demonstrated a willingness to seek help for his problems." (Emphasis added.) In making its finding, the court also considered Randall's testimony pertaining to the respondent's "impulse control and judgment issues, as well as [his] lengthy history of substance abuse which involved arrests and convictions for possession of narcotics."

On the basis of Randall's report and testimony, and the evidence offered by the respondent, the court found that "after eight years of incarceration for various crimes, [the respondent's] release to a sober house in March 2013 is only the beginning of a long road for [the respondent] regarding his rehabilitation. There is no evidence of his ability to maintain his sobriety outside of an institutional setting, his ability to seek and maintain housing and employment, and his ability to avoid new entanglements with the criminal justice system. [He] will be on parole and then probation until October 2018. He is subject to re-incarceration for a violation of the terms of either parole or probation, as well as for the commission of any new offenses. [He] needs to focus on these aspects of his life. It is possible that within a year or two he could achieve a certain level of stability and sobriety." The respondent's efforts to improve his own affairs are certainly commendable, but are not dispositive of the question of whether he could assume a responsible position in the life of his child within a reasonable time. See *In re Halle T.*, 96 Conn. App. 815, 838 n.18, 902 A.2d 670, cert. denied, 280 Conn. 924, 908 A.2d 1087 (2006).

In sum, we cannot conclude that the court's finding regarding the respondent's failure to rehabilitate was clearly erroneous. There was sufficient evidence to support the court's finding and we are not left with a definite and firm conviction that a mistake has been made.

C

The respondent's final contention is directed at the court's finding in the dispositional phase of the proceeding that it was in the best interests of the child to grant the petition for termination of the respondent's parental rights. The respondent contends that this finding was clearly erroneous. We disagree.

"In the dispositional phase of a termination of paren-

tal rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Alison M.*, supra, 127 Conn. App. 211; see footnotes 5 and 6 of this opinion.

The respondent contends that the court's finding that the termination of his parental rights was in the best interests of the child was clearly erroneous because (1) he continues to have meaningful contact with the child, and (2) he has made progress toward rehabilitating himself.

The respondent's efforts to rehabilitate, although commendable, speak to his own conduct, not the best interests of the child. The court nevertheless considered such efforts in its dispositional findings, noting that the respondent "took advantage of services offered to him, including substance abuse, mental health, and visitation" and that he "has made efforts at reunification, including successfully completing several programs while incarcerated. He visited his son while incarcerated and took advantage of any programs that were made available to him." To the extent that the court expressly considered the respondent's efforts to rehabilitate in finding that it was in the child's best interests to terminate the respondent's parental rights, we fail to perceive how such efforts could now undermine the court's best interests finding.

With respect to the respondent's continued and meaningful contact with the child, it is apparent that the court considered this contact in rendering its best interests finding. The record reveals that the court expressly considered that the child "appeared to have a closer attachment to [the respondent]." Although the child may share a bond with the respondent, "[o]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights."

(Internal quotation marks omitted.) *In re Joseph L.*, 105 Conn. App. 515, 531, 939 A.2d 16, cert. denied, 287 Conn. 902, 947 A.2d 341, 342 (2008). The court concluded as much in the present case. It found that, despite a conviction that the respondent "sincerely intends to make positive strides," there was a greater conviction that "it is not in the child's best interest to delay permanency to see if either parent can achieve rehabilitation sufficient to care for the child." The court noted Randall's conclusion that a delay in permanency "could be damaging to [the child's] emotional health and development."

On the basis of the record before us, we decline to disturb the court's finding that the termination of the respondent's parental rights was in the best interests of the child.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** April 23, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of the respondent mother, who has withdrawn her appeal from that judgment. We refer to the respondent father as the respondent in this opinion.

[2] The respondent was paroled to an inpatient treatment facility in March, 2013.

[3] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required . . . ."

[4] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[5] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (2) termination is in the best interest of the child . . . ."

[6] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980,

as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[7] Following the commencement of this appeal, the respondent moved for articulation of the court's judgment with respect to several issues. The court granted the respondent's motion for articulation in part, limiting its articulation to the following question: "What was the specific factual and legal basis for the trial court's finding and determination that the [respondent] waived his right to representation by counsel, and would be allowed to proceed pro se?" Accordingly, the respondent properly preserved this claim for appellate review. See Practice Book §§ 61-10 and 66-5.

[8] Pursuant to General Statutes § 46b-121 (a) (1), "[j]uvenile matters in the civil session include all proceedings concerning . . . termination of parental rights of children committed to a state agency . . . ."

[9] General Statutes § 45a-717 (b) provides in relevant part: "If a party appears without counsel, the court shall inform such party of the party's right to counsel and upon request, if he or she is unable to pay for counsel, shall appoint counsel to represent such party. *No party may waive counsel unless* the court has first explained the nature and meaning of a petition for the termination of parental rights." (Emphasis added.)

[10] See, e.g. *In re Jonathan M.*, 255 Conn. 208, 224–25, 764 A.2d 739 (2001); *State* v. *Anonymous*, 179 Conn. 155, 159, 425 A.2d 939 (1979); *In re Isaiah J.*, 140 Conn. App. 626, 639–40, 59 A.3d 892, cert. denied, 308 Conn. 926, 64 A.3d 333, cert. denied sub nom. *Megan J.* v. *Katz*,      U.S.    , 134 S. Ct. 317, 187 L. Ed. 2d 224 (2013); *In re Zowie N.*, supra, 135 Conn. App. 476–77 n.6.

[11] The respondent refers to the decision of this court in *State* v. *Coleman*, 83 Conn. App. 672, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 16 L. Ed. 2d 1091 (2005), as an example of an appropriate canvass regarding a criminal defendant's request to exercise his or her right of self-representation and corresponding waiver of counsel. Id., 685. In *Coleman*, this court simply set forth the factors of Practice Book § 44-3, which provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

[12] After the other parties addressed the court with respect to the motion to withdraw, the respondent indicated that his problem with his counsel arose during the previous day of trial, when his counsel did not cross-examine the commissioner's witness to the respondent's satisfaction: "That moment was critical. I asked him if he planned on [questioning the commissioner's witness] again, he said it's not his turn. He's letting go of a prime chance at putting forth what I was saying about these lies and cementing [the witness] to these lies which [the witness] has already done anyway, but . . . he's just refusing. I also sent to him a list of people that should

be on a witness list to help me in my case, and he pretty much said to heck with it because [the list contained] the judge that sentence me in drug court. [The judge] doesn't have to come in, obviously, but a letter from him would have been nice so [the judge] can say . . . [the witness] gave me programs [that] she didn't [actually give me]. [The witness] is making accusations that I said things when I got arrested [that] I didn't [say]. I have my police report here. These are all things that he should have questioned [the witness] about to . . . get her in the transcripts, and he's refusing to and he didn't . . . he said he's not [questioning] her again."

[13] The respondent's counsel, prior to the court's inquiry regarding the respondent's preference for substitute counsel, stated that "[the respondent] believes that he would be better off serving himself or without me, whichever."

[14] We note that a difference of opinion as to trial strategy, the basis of the respondent's request for substitute counsel in the present case, does not warrant the appointment of new counsel. See *In re Isaiah J.*, supra, 140 Conn. App. 636; *In re Kaitlyn A.*, 118 Conn. App. 14, 25, 982 A.2d 253 (2009).

_____